## CONVENT OF THE REVEREND CARMELITE NUNS *v.* SILVA.

### APPEAL from the District Court of San Juan.

No. 77.—Decided June 29, 1907.

CHANGES—CIRCULATION OF FOREIGN MONEY—OFFICIAL MONEY.—Even when the circulation of North American, French and Mexican money was authorized in Porto Rico and a legal value was placed upon such money in relation to the official money of the country, they were never considered official money, such only being the *fuerte* money of Spanish coinage the circulation of which was authorized by Royal Decree of 1857 until the year 1895, when the Mexican money was substituted by the special money created for Porto Rico and the value of which was not the same as that of the Spanish money.

ID.—EXCHANGE OF SPECIAL MONEY—SPANISH MONEY.—The exchange of money provided by section 11 of the Organic Act refers only to the special money in Porto Rico and does not include Spanish money properly speaking, or any other foreign money which must be regarded as merchandise, the value of which is subject to the fluctuations of the market.

ID.—OBLIGATIONS CONSTITUTED IN SPANISH MONEY—RATE AT WHICH PAYMENT THEREOF MUST BE MADE.—The payment of obligations constituted in Spanish money must be made in the same money or in American money, not at the rate of exchange established in the Organic Act of Porto Rico, but at the current rate of exchange.

CONSIGNATION OF AMOUNT OF OBLIGATION.—The consignation before a notary public, and not before a judicial authority, of an amount less than that which is due, is not effective to relieve the debtor of the responsibility contracted under his obligation.

ID.—NATURE OF CENSO—REDEMPTION THEREOF.—Although the nature of a *censo* is the assignment of the principal or of the real property in perpetuity or for an indefinite time, nevertheless, a clause to the effect that after the expiration of two annual periods under a *censo*, without the income thereof having been paid, the grantor shall redeem the *censo* and make delivery of the premises, is valid and cannot be held to be contrary to the provisions of section 1511 of the Civil Code.

ID.—ENDOWMENT AGREEMENTS OR MORTGAGE OBLIGATIONS.—Where the obligation partakes of the nature of an endowment agreement, or of the nature of a mortgage, the provisions of section 1511 of the Civil Code are in no wise applicable.

The facts are stated in the opinion.

*Mr. Morera Martínez* for appellant.

*Mr. Falcón* for respondent.

MR. JUSTICE HERNÁNDEZ delivered the opinion of the court.

By public deed executed in this city on March 9, 1867, before Notary Public Juan Basillio Nuñez, Manuel F. Fernández imposed and acknowledged as subject to an annuity (*censo*) and tribute the sum of 2,000 *pesos,* Spanish money, upon a stone house having an upper and lower floor and a flat roof belonging to Fernández, situated on San Justo Street in this city, and bearing government No. 18, in order that said amount might be applied as an endowment for his legitimate daughter, María del Carmen Fernández y Umpierre, who intended to take the veil in the convent of the reverend Carmelite Nuns of this city and in order that with the income of 5 per cent per annum of said sum which the grantor was about to pay the administrator of the said convent so that his said daughter could and would meet the expenses of her profession, the capital of 2,000 *pesos,* Spanish money, was to remain as a charge on the house in question, with the obligation on the part of Fernández and his legitimate successors in the ownership thereof to faithfully and religiously pay the corresponding interest, with the understanding that if two annual installments should pass without being paid both Fernández and his heirs and successors would be obligated to separate the principal in order to place it on another estate or take such action as the proper court might order, and that the separation or transfer of said principal, in whole or in part, should not be made without the express knowledge and consent of the said court, it being further understood that the interest was to be paid at the end of every year free from all charges and contributions, the said house being mortgaged to secure compliance with the agreement made in said deed. This deed further stated that the said 2,000 *pesos* came from the 6,841.49⅓ *pesos* which Fernández

had in his possession belonging to his said daughter, to whom said sum had been awarded by virtue of a legacy from her paternal grandmother, Francisca Martínez, of one-third of her property.

By another public deed executed before the same notary on the same day, March 9, 1867, the said Manuel F. Fernández imposed and acknowledged an additional sum of 2,000 *pesos,* Spanish money, subject to an annuity (*censo*) and tribute upon the aforesaid house in order that said sum might be applied as an endowment for Peregrina Navarro y Lemos, who also intended to profess as a nun in the convent of the Reverend Carmelite Nuns of this city and to whom María del Carmen Fernández y Umpierre had offered an endowment from part of the principal which she had in her possession belonging to her father, Manuel F. Fernández, said deed containing the same conditions, obligations and clauses as the previous deed.

Upon Julián Silva becoming the owner of the house subject to the charges referred to, he refused to pay the interest for the years 1903 and 1904 on account of differences having arisen between the debtor, Silva, and Manuel Díaz Caneja, the collector of religious endowments of the Catholic Bishopric of Puerto Rico and the administrator of the property and rights of the Carmelite monastery or convent, as to the amount which should be paid as interest for said two years, because while the community of Reverend Carmelite Nuns, represented by Díaz Caneja, claimed payment of 400 Spanish *pesos* or their equivalent in American gold at the current rate of exchange for the two years mentioned, Silva was disposed to pay only $240 in American money now current, which sum he delivered on March 2, 1905, to Notary Julio César González, of this city, to be delivered to Díaz Caneja, who refused to receive it on the ground that it was not the sum due, as shown in the return relating to the tender of the same date.

The facts stated led Manuel Díaz Caneja as the collector of religious endowments of the Catholic Bishopric of Puerto Rico and as the administrator of the property and rights of the Carmelite monastery or convent to file a complaint in the District Court of San Juan on March 18, 1905, against Julián Silva, praying that after the legal proceedings Silva should be adjudged to return in due time the 4,000 *pesos* representing the charges imposed upon house No. 18, San Justo Street, which Silva possessed, and to pay the interest accrued since January 1, 1903, and accruing hereafter, at the rate of 5 per cent, without any discount whatsoever, all in Spanish *pesos fuertes* or its equivalent in American gold at the current rate of exchange plus legal interest on said arrears of interest, with the costs against the defendant.

Julián Silva in answering the complaint contested the same alleging that it was not proper that the rate of interest should be constantly changed in accordance with the rate of exchange when payment thereof was made; that during its time Spanish money had its proper exchange, being substituted by different money until the present time when the current money is American; and that the return of the principal of the encumbrances is improper, as the nonpayment of the last two yearly instalments has been due to the fault of the plaintiff, who could have accepted the payment which he had attempted to make through notarial tender, without prejudice to the enforcement of any rights he might believe himself entitled to, apart from the fact that the person entitled to an annuity cannot demand such return, as the redemption of an annuity is exclusively reserved to the grantor, even in the event that there should be an agreement to the contrary; for which reason the defendant prayed that the complaint be dismissed, with the costs against the plaintiff, and that it be ordered that the latter accept in the capacity in which he acts the amount deposited by Silva, being the sum of $240, in payment of the two yearly instalments pending, the amount

due, after deduction of 40 per cent by reason of the change of money made at the rate stated.

The District Court of San Juan, by its judgment of August 21 of last year, held that the facts and the law were against the plaintiff; and therefore dismissed the complaint with the costs against said plaintiff. From this judgment the representative of the Reverend Carmelite Nuns took an appeal, which is now pending the decision of this Supreme Court, to be rendered after the written and oral allegations of counsel for the parties have been heard and considered.

The legal questions to be discussed and decided in this appeal are the following:

1. Whether the payment of interest on the principal of the two annuities (*censos*) in question should be made in American money at the rate of exchange prescribed by section 11 of the Organic Law of Porto Rico, approved April 12, 1900, as alleged by the defendant, or whether on the contrary it should be made in Spanish money or its equivalent in American gold at the current rate of exchange, as alleged by the plaintiff.

2. Whether Silva, having failed to pay two yearly instalments of the interest on the two principal sums past due, he can be compelled to return the latter.

With regard to the first question, we are of the opinion that section 11 of the Organic Law of Porto Rico is not applicable to this case. Let us see.

By Royal Decree of May 5, 1857, the exchange of the *macuquina* money then in circulation in this Island for *fuerte* money of Spanish coinage was ordered, and in this connection the Governor General, on July 27 of said year, issued a number of orders tending to the execution of such exchange, among which orders we find that No. 10, which provided that after said date only said Spanish money should remain in circulation as legal tender for all transactions of exchange, purchases, sales, and other uses to which it is destined, at

the same time establishing in all offices and for all public documents a system of accounting in *pesos fuertes* and *centavos* thereof.

The principal sums referred to in the two deeds of March 9, 1867, executed by Manuel F. Fernández, were recognized in this kind of money—that is to say, in *pesos fuertes*.

Subsequently—that is to say, by Royal Order of November 20, 1867—the order of the Superior Civil Governor of this Island authorizing the circulation herein of United States and French gold coin, with a discount of 5 per cent on Spanish money, was approved, and by another Royal Order of March 26, 1877, it was provided that the Government should admit in this Island the Spanish gold ounce at the rate already established in commerce at $17, American currency.

From these two Royal Orders it is to be deduced that not only was the Spanish *fuerte* money with milled edges in official circulation in this Island, but also the United States and French money, though they were not of equal value, as the latter with relation to the former was subject to depreciation.

In the course of time Mexican silver coin caused a monetary crisis in the country owing to the effect of its depreciation in the foreign markets in relation with the legal and official value it had here, and to meet this crisis the Governor General of this Island issued a decree under date of November 18. 1885, ordering, among other things, that Mexican silver coin in circulation should retain the official value it then had in the public treasury and in commerce, and that upon the expiration of the periods fixed all Mexican silver coin introduced through the custom houses would be marked, and would not be accepted in the Treasury nor be legal tender.

As will be observed, United States, French and Mexican money had legal value in Porto Rico, but it was not official currency, that character being reserved to the Spanish money.

At this stage came the Royal Decree ordered executed on December 7, 1895, published in No. 148 of the Official Gazette of this Island on the 10th of said month of December. This Royal Decree provided that Mexican money should be withdrawn from circulation, and in substitution of the Mexican *pesos* in circulation in the Island a special currency was created—that is to say, a Spanish *peso* of the exact dimensions and standard of the 5 *peseta* piece of the Peninsular provinces—and it was also ordered that the foreign fractional currency in circulation in Porto Rico should be called in and recoined and exchanged for the special fractional currency identical as to fineness and standard similar with the money then in circulation in the said provinces. This Royal Decree does not contain any provision equaling the special and Spanish money properly so-called; but, on the contrary, it was provided that the Government should present to the Cortes, when experience should demonstrate the advisability thereof, a bill authorizing the circulation of such special money in the provinces of Spain and adjacent islands.

With regard to the value of the special money which took the place of the Mexican, it was not the equal of the Spanish money, as both parties have agreed that after the change, exchange on Spain was quoted at 25 to 33 per cent.

The exchange for money of the United States, ordered by section 11 of the Organic Act of Porto Rico of March 24, 1900, refers to this special money, and such exchange does not comprise the Spanish money properly so-called or any other kind of foreign money, and consequently such money must be considered as merchandise the value of which is subject to the rise and fall of exchange. The litigants have accepted by mutual agreement the fact that between July, 1906, and August 9 following, when the trial was held, exchange on Spain was quoted at from 10 to 11 per cent.

The obligations embodied in the two deeds of March 9, 1867, having been contracted in Spanish money, the provi-

sions of section 1138 of the Civil Code in force is applicable thereto. Said section reads as follows:

"Payment of debts of money shall be made in the specie stipulated and, should it not be possible to deliver the specie, in legal silver or gold coin current in Porto Rico."

In accordance with the foregoing provision of law the defendant, Julián Silva, is obliged to pay the interest in question in Spanish money or also in American money, not at the rate of exchange established in the Organic Act of Porto Rico, but at the rate of exchange current on August 9, 1906, when the trial was held, which rate should be 11 per cent, because although both parties have agreed that exchange on Spain was quoted at from 10 to 11 per cent, we must accept the quotation of 11 per cent as more favorable to the defendant. The first legal question raised must be answered in the foregoing terms.

With regard to the second question, we are of the opinion that the deposit by Silva of $240 with a notary cannot be considered as a performance of his obligation to pay interest, because that amount was not the amount due, the amount due being that of 400 *pesos* in Spanish or American money at the current rate of exchange, as we have stated, nor was the deposit made by judicial authority, for which reason it cannot be considered valid and relieve him of liability, according to sections 1125, 1145 and 1146 of the Civil Code.

Silva having failed in the payment of two yearly installments of interest on the two principal sums claimed, he has incurred the obligation of separating them and delivering them as agreed in the two deeds of March 9, 1867, which separation and delivery, for the reasons above set forth must be made in Spanish money or American money at the rate of exchange of 11 per cent.

Section 1511 of the Civil Code cited, which provides that the nature of the annuity (*censo*) requires that the transfer of the principal or of the estate should be perpetual or for an unlimited time, cannot be cited in opposition, because section 1222 of said Code provides that the contracting parties may make the agreements and establish the clauses and conditions which they may deem advisable provided they are not in contravention of law, morals, or public order; and we see no reason to include in this exception the agreement that if two installments of the interest on an annuity (*censo*) should fall due and remain unpaid, the grantor must redeem and deliver the capital of the annuity (*censo*), as is now the case with respect to Julián Silva.

And note that we are not discussing (because we consider it unnecessary), whether the deeds of March 9, 1867, really do establish transferable annuities, as defined by section 1509 of the Civil Code, or whether they partake of the nature of endowment agreements or mortgage obligations, in which case section 1511, invoked in his defense by counsel for Julián Silva, could not be applicable to them in any respect. From any point of view that they may be considered they reveal the existence of obligations now affecting Silva and to the performance of which he is bound under the terms stipulated.

For the reasons stated we believe that the judgment appealed from of August 21 of last year should be reversed, and that in its place judgment should be rendered sustaining the complaint and adjudging Julián Silva to return the 400 *pesos* claimed and to pay the interest accrued and accruing since January 1, 1903, at the rate of 5 per cent per annum, all in Spanish *fuerte* money or its equivalent in American gold, with the discount of 11 per cent which the Spanish money will suffer in relation to the American money, plus legal interest on the interest for the years 1903 and 1904, with

the costs of both instances against the defendant and appellant.

*Accordingly decided.*

Chief Justice Quiñones and Justices Figueras, MacLeary and .Wolf concurred.